FILED
United States Court of Appeals
Tenth Circuit

**July 1, 2008**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ESSA KABBA,

      Petitioner,

v.

MICHAEL B. MUKASEY,
United States Attorney General,

      Respondent.

No. 07-9532

**ON PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF
IMMIGRATION APPEALS**

Submitted on the briefs:*

Patrick C. Hyde, Patrick C. Hyde, P.C., Denver, Colorado, for the Petitioner.

Jeffrey S. Bucholtz, Assistant Attorney General, Mary Jane Candaux, Assistant
Director, and Michael C. Heyse, Trial Attorney, Office of Immigration Litigation,
Civil Division, United States Department of Justice, Washington, D.C., for the
Respondent.

Before **LUCERO**, **PORFILIO**, and **BRORBY**, Circuit Judges.

**LUCERO**, Circuit Judge.

---

   * The case is unanimously ordered submitted without oral argument
pursuant to Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G).

Essa Kabba, a native of Sierra Leone, entered the United States without authorization. He applied for asylum, asserting past persecution and a fear of future persecution based on his political opinion or imputed political opinion. His asylum application was also construed as a request for a restriction on removal[1] and for protection under the Convention Against Torture ("CAT"). Finding that Kabba was a credible witness, the Immigration Judge ("IJ") determined that Kabba had established a well-founded fear of persecution and granted his asylum application. In an appeal filed by the government, the Bureau of Immigration Appeals ("BIA") concluded otherwise. In the BIA's view, Kabba was not a credible witness because he presented fraudulent documents to the IJ, and because it found omissions and inconsistencies in certain statements that Kabba made during the proceedings. On this basis, the BIA determined that Kabba was ineligible for both asylum and restriction on removal. The BIA further concluded that relief under the CAT was unwarranted because country conditions in Sierra Leone had changed such that Kabba should not fear returning. It directed the IJ to enter an order of removal against Kabba.

---

[1] Although the parties refer to "withholding of removal," this language was changed to "restriction on removal" with the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. We use the statutory term "restriction on removal." See Ismaiel v. Mukasey, 516 F.3d 1198, 1200 n.2 (10th Cir. 2008).

On remand, the IJ ordered Kabba's removal, and the BIA dismissed Kabba's subsequent appeal. Kabba then petitioned this court for review, primarily contending that the BIA did not appropriately review the IJ's credibility determination under the clearly erroneous standard, as required by 8 C.F.R. § 1003.1(d)(3)(i). We agree. Exercising jurisdiction under 8 U.S.C. § 1252(a)(1), we therefore grant the petition for review on Kabba's requests for asylum and restriction on removal, and remand for further proceedings. We deny, however, the petition for review as to the request for CAT relief.

## I

### A

Kabba, a native speaker of Mandingo, filed an asylum application with the assistance of an individual who spoke a different dialect and with the help of an interpreter. In the application, he stated that he sought asylum because he feared being killed by Revolutionary United Front ("RUF") rebels if he returned to Sierra Leone. He recounted that in October 2000, four RUF rebels raped his wife, held a gun to his head, threatened to kill him, and kidnapped his wife and children. Kabba also explained that for thirteen years before the rebel attacks in Sierra Leone, Kabba's brother was associated with a political and environmental group called "Sumpu Ado Kathy," which opposed the RUF rebels. His brother, Kabba stated, was killed by rebels while giving a speech about natural resources and diamond development. After these events, Kabba left Sierra Leone and

- 3 -

traveled to Guinea where he met a friend whom the application states was an RUF rebel. That friend helped Kabba obtain a passport, visa, and airplane ticket to Canada, where Kabba stayed until he entered the United States.

The IJ considered Kabba's application over the course of two evidentiary hearings, holding the first hearing on April 19, 2004. Because Kabba and his interpreter spoke different dialects of Mandingo, and because Kabba was becoming frustrated with the translations problems, the IJ terminated the first hearing. Proceedings began anew at a second hearing on November 1, 2004, where a different interpreter who spoke Kabba's dialect assisted.

At the second hearing, Kabba presented evidence that was significantly more detailed than the statements he made in his asylum application. The evidence indicated that Kabba was born in February 1951 in Koidu, Sierra Leone, in the Kono District, a location famous for its diamond mines. A diamond digger by trade, Kabba had no education other than some schooling in the Koran. He does not know how to read or write.

Kabba testified that he feared being persecuted or killed by the RUF rebels if he returned to Sierra Leone. He explained that the rebels had persecuted him in the past because of his politics and his support for the government. Kabba stated that he, his father, and his brother all supported the then-president of Sierra Leone, Tijan Kabbah. His brother held gatherings to support Kabbah's election,

and Kabba drove his brother's car to pick up people for the gatherings. According to Kabba, the rebels were aware of his actions.

Kabba also testified that the RUF rebels persecuted him on three different occasions. First, in October 2000, RUF rebels killed his brother because he refused to support them. After his brother was killed, Kabba's father, son, and older daughter left Koidu because his father feared that the RUF rebels would come for them as well. Kabba did not know why the rebels chose this particular time to kill his brother, as his brother had supported the president for many years. Two weeks later, also in October 2000, RUF rebels attacked several citizens in Koidu, killing sixteen people including one of Kabba's daughters.

Then, at the end of the same month, four RUF rebels came to Kabba's home. They each raped his wife and took turns holding a gun to his head, forcing Kabba and his daughter to watch the abuse. The rebels decided not to kill Kabba, however, because the child was crying, but they did warn him that they would kill him if they returned and he refused to support them. The rebels then kidnapped Kabba's wife and daughter. He does not know where the rebels took them.[2]

In early November 2000, Kabba decided to leave Koidu because he did not want to wait for the rebels to come back and kill him. He first went to Guinea

_____

[2] Although the asylum application indicated that his brother was killed after, rather than before, his wife and ten-year-old daughter were taken, Kabba testified that the man who helped him prepare the asylum application made a mistake.

- 5 -

with seven other people, traveling mostly at night. His group arrived in Guinea on November 10, 2000, and he paid a truck driver to transport him to Conakry. Kabba and other individuals hid behind merchandise in the truck. After arriving in Conakry, Kabba went to a mosque where he met Bangoura, a friend of his brother.[3] Bangoura obtained for Kabba a Canadian visa, an airplane ticket, and a Guinean passport under a false name. Kabba then traveled to Canada with a man named Jallow. Upon reaching Canada, Kabba gave the return plane ticket and passport to Jallow. Two weeks later, Kabba traveled by bus to Minneapolis, Minnesota where he initiated asylum proceedings. He later traveled to Aurora, Colorado, where he stayed with Banta Sumbunu, the brother of a former business associate.

Kabba presented several documents to the IJ in support of his application for asylum. Among other things, he submitted his birth certificate and a Sierra Leone identification card, which the U.S. Immigration and Customs Enforcement's Forensic Document Laboratories ("FDL") concluded were inauthentic. In response to FDL's finding, Kabba explained to the IJ that his father obtained the documents for him after the fighting with the RUF rebels began because his father knew that the family would not stay in Sierra Leone.

---

[3] Kabba testified that Bangoura was a businessman in the diamond trade, and not an RUF rebel as the asylum application indicated. Kabba explained that the man who helped him prepare the asylum application did not understand him and had incorrectly noted that Bangoura was a rebel.

- 6 -

Kabba further testified that his father obtained a photocopy of the original birth certificate, not an original. Kabba stated that he thought the documents were authentic when he provided them to the immigration authorities.

In addition to Kabba's testimony, the IJ heard testimony from Banta Sumbunu. He stated at the hearing that his brother, Baba Sumbunu, told him that Kabba is from Sierra Leone, and Kabba presented a notarized letter from Baba Sumbunu stating that he knew Kabba ten years ago in Sierra Leone. Baba was originally scheduled to testify by telephone, but the IJ decided that his testimony was unnecessary.

Kabba also presented a letter from the Sierra Leone Ministry of Internal Affairs certifying that he is from Sierra Leone and a resident of Koidu, Kono. In addition, he submitted an eight-page report from the Rocky Mountain Survivor Center, where he was treated twenty-four times during a period of over a year by therapist David Harris, and eight times by Dr. Kirk Anderson, a psychiatrist. The report explained that Kabba was diagnosed with major depressive disorder and post-traumatic stress disorder, which is common for persons who endure physical threats and psychological torture. Harris stated that Kabba told a consistent story throughout his treatment sessions.

Lastly, Kabba presented a letter from the National League for Human Rights and Democracy advising him not to return to Sierra Leone. The letter warned that the peace was fragile and that secret killings of persons who oppose

the rebels continue, because those persons could serve as witnesses against the rebels in special court proceedings.

**B**

After reviewing the testimony and documentary evidence, the IJ granted Kabba's application for asylum. Noting Kabba's lack of education, the mental health report, and the general consistency between his testimony at the April 19, 2004, and November 1, 2004, hearings, the IJ concluded that Kabba was a credible witness. Specifically, the IJ stated that Kabba's "testimony was . . . sufficiently detailed, consistent and believable to provide a plausible and coherent account for his fears and he [did] not need to establish further corroborating evidence to present his case." Although the IJ recognized that Kabba's birth certificate and the Sierra Leone identification card were not authentic, the IJ accepted Kabba's statements concerning the documents and the fact that he received them from his father. The IJ also noted that although Kabba did not always know the exact dates of certain events, Kabba's trauma and his limited education explained the lack of precision in the testimony. Additionally, the IJ found that Kabba would face persecution if he returned to Sierra Leone and that the Sierra Leone government is not in control of the country.

The Department of Homeland Security appealed the IJ's decision. Concluding that the IJ's credibility determination was clearly erroneous, see 8 C.F.R. § 1003.1(d)(3)(i), the BIA sustained the appeal and remanded the matter

to the IJ to enter an order of removal.  The BIA based its reasoning on three concerns.  First, it found that the IJ had predicated his credibility determination solely on the similarities between Kabba's testimony at the two hearings.  Noting that the IJ found that Kabba's birth certificate and identification card were not authentic, the BIA concluded that Kabba was unable to rebut or explain the lack of authenticity.  The BIA also considered Kabba's responses to questions about the documents to be too general and, at times, confusing.

Second, the BIA reasoned that various inconsistencies and omissions in the record supported an adverse credibility finding.  Pointing to differences in Kabba's testimony at his two hearings and in his statements in his asylum application, the BIA wrote:

> [Kabba] testified in November 2004, that he was mistreated in Sierra Leone because he was involved in "politics," was a member of a political group, and "helped Tijan," the president of Sierra Leone.  In contrast, while [he] stressed his brother's political involvement and support of the Sierra Leonean president at the April 2004 hearing, he never indicated that he had been a personal supporter of the president or that he was personally involved in a political group.  He also failed to mention his support of the president or his involvement in "politics" in his asylum application.  Rather, he expanded upon his brother's involvement in the country's government and a group called "Sumpu Ado Kathy."  We note that while [Kabba] was able to name the specific group that his brother was involved with in his asylum application, he could not identify the group during the November 2004 hearing.  In fact, he testified that he was involved with the same group.  However, he admitted that he could not "pronounce" the name and did not know the name as he was "not educated."

The BIA concluded that Kabba had failed to provide persuasive reasons for these discrepancies. Unlike the IJ, the BIA rejected the conclusion that Kabba's lack of education and the alleged errors made by the individual preparing his asylum application were sufficient to explain the discrepancies. Third, in denying relief under the CAT, the BIA found that the country conditions in Sierra Leone had changed such that Kabba need not fear returning to his home country.

Thus, based solely on its conclusion that he was not credible, the BIA determined that Kabba could not establish eligibility for either asylum or a restriction on removal. Moreover, because Kabba did not assert fear of the Sierra Leone government and because current country conditions did not suggest it was more likely than not that he would be tortured if he returned to Sierra Leone, the BIA denied relief under the CAT.

One Board member dissented from the BIA's decision, stating that "th[e] record [did] not support finding the [IJ's] credibility determination to be clearly erroneous." The dissent noted that the inconsistencies pointed to by the majority were not central or material to the IJ's decision to grant asylum based on political persecution, and that the IJ based his grant of asylum on the entirety of Kabba's testimony, which the IJ found to be sufficiently detailed and consistent such that additional corroborating evidence was not needed.

After the IJ entered an order of removal on remand, Kabba appealed that adverse action to the BIA, which affirmed and reincorporated its prior decision. The BIA also supplemented its prior decision by stating that it did not engage in fact finding in its first decision and that the IJ's credibility finding was clearly erroneous. The BIA also rejected the letter that Kabba submitted from the Sierra Leone Ministry of Internal Affairs certifying his nationality. It found that the letter did not overcome FDL's conclusions regarding the authenticity of the documents Kabba submitted, that the letter was unauthenticated, and that the record did not disclose how Kabba had obtained the letter.

Following the BIA's denial of his appeal, Kabba petitioned this court to review the BIA's decision. He principally argues that the BIA committed legal error by analyzing the IJ's credibility determination de novo, rather than under the required clearly erroneous standard.

## II

## A

Because a three-member panel issued the BIA's opinion, we review that opinion rather than the IJ's oral decision. See Sidabutar v. Gonzales, 503 F.3d 1116, 1123 (10th Cir. 2007). "We review the BIA's legal determinations de novo, and its findings of fact under a substantial-evidence standard." Niang v. Gonzales, 422 F.3d 1187, 1196 (10th Cir. 2005).

Under 8 C.F.R. § 1003.1(d)(3)(i), the BIA is required to review an immigration judge's factual findings—including credibility determinations—for clear error, and only clear error. The critical issue in this appeal is how we, in turn, review the BIA's application of that clear error standard. Did the BIA's application of the clear error standard simply amount to factual determinations which we review under the highly deferential substantial-evidence standard? Or did the BIA commit possible legal error by reciting the clear error standard but actually applying a far less deferential standard of review to the IJ's credibility determinations, in which case we would review that application of law de novo.

Kabba urges the latter approach, framing his challenge to the BIA's decision as a purely legal one. He maintains that although the BIA claimed to review only for clear error, if we look below the surface, we will find that it exceeded its role by improperly making in its own findings of fact regarding Kabba's credibility. Unsurprisingly, the government sees no error of law, and would have us simply apply substantial-evidence review to the BIA's opinion while disregarding whether the BIA, which had only the benefit of the cold record, truly gave proper deference to the IJ's first-hand credibility determinations.

It is surely uncontroversial that "when a lower court's factual findings are premised on improper legal standards or on proper ones improperly applied, they are not entitled to the protection of [a lesser standard of review] but are subject to

*de novo* review." In re Kretzinger, 103 F.3d 943, 946 (10th Cir. 1996) (quotation omitted); see also Brue v. Gonzales, 464 F.3d 1227, 1232 (10th Cir. 2006) (discussing de novo review of legal issues). The only real question, then, is whether we take the BIA at its word when it claims that it reviewed only for clear error, or instead look at its actual mode of analysis in rejecting the IJ's credibility determinations. We think that under these rare circumstances— where an IJ makes factual credibility determinations which the BIA in turn rejects—Kabba is correct that we must consider de novo whether the BIA, in making its own factual findings, actually reviewed the IJ's decision only for clear error. Common sense as well as the weight of authority requires that we determine whether the BIA applied the correct legal standard, not simply whether it stated the correct legal standard. See, e.g., Ramirez-Peyro v. Gonzales, 477 F.3d 637, 641 (8th Cir. 2007) (holding that "[a]lthough the Board set forth the appropriate standard of review at the outset of its decision in this case," whether the BIA properly applied that standard was a question of law); Chen v. Bureau of Citizenship & Immigration Servs., 470 F.3d 509, 513-14 (2d Cir. 2006) (finding legal error when "[a]lthough the BIA cited the proper legal standard at the outset of its decision, it failed to apply this deferential standard of review when evaluating the IJ's credibility finding").

**B**

Under 8 C.F.R. § 1003.1(d)(3)(i), the BIA cannot "engage in *de novo* review of findings of fact determined by an [IJ]." Instead, the BIA reviews those facts found by the IJ—including credibility determinations—only to determine whether they are clearly erroneous. Id.; see also Ramirez-Peyro, 477 F.3d at 641 (recognizing that the BIA "must defer to the factual findings of the [IJ] unless they are clearly erroneous"). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). Indeed, under the BIA's own procedures, it may not overturn an IJ's factual findings "simply because the [BIA] would have weighed the evidence differently or decided the facts differently had it been the factfinder." Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,878, 54,889 (Aug. 26, 2002) (citing Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)).

Our review of the record reveals that, as a purely legal matter, the BIA's rigorous review of the IJ's credibility findings, and its ultimate reversal, exceeded the bounds of clear error review. This is a case where "there are two permissible views of the evidence," and under such circumstances, "the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574.

- 14 -

Although the BIA's opinion set forth the correct standard of review and recited a conclusion that the IJ's credibility findings were clearly erroneous, the BIA did not apply this deferential standard in substance. As our discussion of the record will show, it instead engaged in its own fact finding in violation of § 1003.1(d)(3)(i).

**1**

We begin by examining the BIA's conclusion that the IJ disregarded the inauthenticity of Kabba's birth certificate and identification card. We note that the IJ reviewed the entire record, basing his credibility finding not just on similarities in testimony between the two hearings as the BIA maintained, but also on the mental health report, Kabba's demeanor, his explanation of the documents provided, and his overall lack of education.

With regard to the documents, the IJ specifically acknowledged their inauthenticity, but nonetheless found Kabba credible because the IJ accepted that Kabba did not know that the documents were inauthentic. Needless to say, if Kabba was unaware that the documents were not authentic, their forged status cannot impugn his credibility. See Corovic v. Mukasey, 519 F.3d 90, 97-98 (2d Cir. 2008) ("[W]hen an applicant contests that he knowingly submitted a fraudulent document, the IJ must make an explicit finding that the applicant knew the document to be fraudulent before the IJ can use the fraudulent document as the basis for an adverse credibility determination."); Kourski v. Ashcroft,

355 F.3d 1038, 1040 (7th Cir. 2004) ("[I]f the applicant has no reason to know that the document is forged, its existence does not undermine his credibility, though it deprives his testimony of the extra boost to credibility that it would have if it were corroborated.").

As the IJ found, nothing in the record suggests that Kabba knew or should have known that the documents were not authentic. See Yeimane-Berhe v. Ashcroft, 393 F.3d 907, 911 (9th Cir. 2004). "The government did not disprove [Kabba's] testimony disavowing knowledge of the [lack of authenticity.]" Corovic, 519 F.3d at 98. And although the government may base "an adverse credibility determination upon submission of fraudulent documents if the petitioner fails to offer a legitimate explanation for the suspected fraud," Averianova v. Mukasey, 509 F.3d 890, 896 (8th Cir. 2007) (quotation omitted), here the IJ found that Kabba offered a legitimate explanation. This was a factual finding entitled to deference on review.

In reversing the IJ's decision, the BIA stated that Kabba provided only general and, at times, confusing responses to questions regarding the documents. Yet the IJ never concluded that Kabba's testimony was confusing or general. It is thus apparent that the BIA actually reweighed the evidence submitted, which it is not permitted to do on clear error review, and that it simply substituted its own judgment for that of the IJ. Moreover, the BIA did so without determining that Kabba knew the documents were not authentic. It therefore committed legal error

- 16 -

in overruling the IJ's credibility finding without a foundation upon which to conclude that the IJ had committed clear error.

2

We turn next to the BIA's second basis for concluding that Kabba was not credible: the presence of omissions and inconsistencies in Kabba's testimony and his asylum application. At the threshold, we again emphasize that Kabba experienced translation difficulties during both the preparation of his application and during the first hearing; indeed, the IJ had the opportunity to witness the translation problems in the first proceeding—and Kabba's resulting frustration—firsthand. So although the IJ also identified some omissions and inconsistencies, he found that Kabba's testimony was, on the whole, sufficiently detailed and consistent to be considered truthful.

In reviewing the IJ's decision on appeal, the BIA relied only on those differences between Kabba's testimony and his statements in his asylum application that concerned his political involvement. Unlike the IJ, the BIA concluded that Kabba did not provide a persuasive explanation for these differences. Our review of the various inconsistencies cited by the BIA, however, reveals that it again engaged in de novo rather than clear error review.

Looking first to Kabba's asylum application, our record review confirms that the application and Kabba's testimony are not clearly contradictory, and that the differences between the two largely stem from the amount of detail provided.

As we have previously cautioned, the terseness of an application is an insufficient reason for the BIA to reject an IJ's credibility determination. See Ismaiel, 516 F.3d at 1206 (noting that the agency "must be sensitive to the pressures bearing on persons seeking to escape persecution and make allowances for omissions in detail in their early accounts of what befell them"). Kabba filed his asylum application without the assistance of an attorney, shortly after arriving in the United States and just months after the deaths of his brother and daughter, the rape of his wife, and the kidnapping of his wife and another daughter. Under such circumstances, we cannot expect exhaustive perfection in an asylum application. Cf. id. (petitioner was entitled to less leeway when omissions were "in a typed form prepared with the assistance of counsel almost four years after [petitioner] entered the country"). Furthermore, the IJ had before it evidence that Kabba's friend, who helped him prepare the application, did not always understand Kabba, and failed to read back to Kabba what he had written.

The other inconsistencies identified by the BIA are no more availing. The BIA specifically pointed to differences between Kabba's November 1, 2004, testimony where he asserted that he was personally involved in politics, and his earlier April 19, 2004, testimony and application statements emphasizing his brother's political involvement without mentioning his own. Puzzlingly, the BIA failed to take into account that the April hearing was cut short due to translation problems and that the hearing began anew in November. The IJ therefore did not

commit clear error by discounting slight differences between testimony in the two hearings since they were attributable to the translation problems and Kabba's resulting frustration.

Furthermore, the IJ unambiguously recognized that Kabba's brother participated in politics more than Kabba did, and yet found Kabba to be a credible witness, despite his asylum application's failure to mention his personal involvement in politics. Without explanation, the BIA ignored this finding when making its own credibility assessment. As we see it, when rejecting the IJ's credibility findings under a review purportedly targeted only at clear error, the BIA cannot selectively examine some evidence while ignoring other evidence presented to it. Based on our independent review of the record, we think it plain that the BIA substituted its own judgment for that of the IJ and that it did not defer to the IJ's findings.

Additionally, the BIA focused on the fact that Kabba could not state the name of the political group to which his brother belonged during his November 2004 testimony, but identified it in his asylum application as "Sumpu Adu Kathy." After receiving all the evidence and observing Kabba's demeanor, the IJ apparently did not find this discrepancy significant. Unlike the BIA, the IJ noted the mental health report, which indicates that Kabba stated that his brother was a leader in the political group "Supuadukhatty." Although the spellings differ, both names are almost phonetically identical. The IJ thus relied on evidence that, on at

least two occasions, Kabba was able to identify the political group by name. Although the record does not explain why Kabba may not have identified the group by name during the November hearing, this alone is an insufficient basis for the BIA to have decided the issue of credibility differently than the IJ when it was tasked with exercising deference to the IJ's credibility conclusion.[4]

Accordingly, we conclude that although the BIA stated that it was reviewing for clear error, it failed to give deference to the IJ's findings and improperly engaged in its own fact finding. By substituting its own judgment for that of the IJ, the BIA impermissibly engaged in de novo review contrary to § 1003.1(d)(3)(i). See Chen, 470 F.3d at 514-15.

## C

Relying on a State Department report, the BIA also found that country conditions in Sierra Leone had changed such that Kabba could no longer have a well-founded fear of future persecution. The government maintains that we can affirm the BIA's decision on this independent basis because Kabba did not challenge the BIA's finding regarding country conditions, and has thus waived any challenge to that finding.

---

[4] On appeal, the government points to other inconsistencies in Kabba's statements, arguing that Kabba testified at the April 2004 hearing that his brother-in-law was murdered and that his asylum application failed to mention his daughter's murder. These inconsistencies, however, were not mentioned in the BIA's decision and therefore were not the basis for its conclusions. We thus decline to consider them in this proceeding.

We agree, to a limited extent. Kabba mentions country conditions only in passing in his opening brief when discussing the BIA's decision, but he does not present any argument to specifically challenge this aspect of the BIA's opinion. See Aplt. Opening Br. at 8 ("The Board concludes pursuant to the U.S. State Department Reports of 2001, regarding the Human Rights violations in the year 2000, that the country conditions in Sierra Leone were such that the Respondent need not fear returning to Sierra Leone.").[5] Thus, because the issue was insufficiently raised in the opening brief, we agree that it has been waived. See Becker v. Kroll, 494 F.3d 904, 913 n.6 (10th Cir. 2007); Krastev v. INS, 292 F.3d 1268, 1280 (10th Cir. 2002).

But the BIA's findings regarding country conditions explicitly applied only to Kabba's CAT claim. The BIA wrote that "[Kabba] has not alleged a fear of the Sierra Leonean government and current country conditions, as discussed above, do not suggest that if the respondent is removed to Sierra Leone he will be more likely than not to be tortured, as required for relief under the [CAT]," citing to regulations relating to the CAT. Kabba's waiver of this issue therefore affects only his claim for relief under the CAT and not the BIA's decision on asylum and

_____

[5] Kabba argues in his reply brief that he preserved an argument that country conditions had not changed in his Docketing Statement with this court. But this cannot salvage his claim. Any issue raised in a Docketing Statement, but not argued in the opening brief is deemed abandoned for purposes of appeal to this court. Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 979 n.43 (10th Cir. 1990).

restriction on removal, which was predicated solely on its disagreement with the IJ's credibility findings.

## III

In sum, we conclude as a matter of law that the BIA did not properly review the IJ's credibility finding under the clearly erroneous standard. We therefore **GRANT** the petition for review as to the asylum and restriction on removal requests, **VACATE** the decision of the BIA on those requests, and **REMAND** to the agency for further proceedings consistent with our decision. See Ramirez-Peyro, 477 F.3d at 641; see also Gonzales v. Thomas, 547 U.S. 183, 186 (2006) (per curiam) (requiring remand to agency for additional investigation and explanation). We **DENY** the petition for review on the CAT request. Because our decision vacates the order of removal, our temporary stay is dissolved as moot.