FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**March 13, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

_____

GERARDO CABALLERO-VEGA,

    Petitioner,

v.

MERRICK B. GARLAND, United States
Attorney General,

    Respondent.

No. 21-9506
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HOLMES**, Chief Judge, and **EBEL** and **EID**, Circuit Judges.[**]

_____

Gerardo Caballero-Vega,[1] a Mexican citizen, entered the United States in 1993

without admission or parole by an immigration officer when he was eight years old.

He was removed to Mexico in 2019.  Shortly after his removal, Caballero-Vega

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore submitted without oral argument.

[1] Caballero-Vega's last name is often misspelled as "Cabellero-Vega" throughout this litigation, including in the caption on appeal.  We use the correct spelling in this order and judgment and direct the Clerk's Office to correct the case caption as well.

returned to the United States and applied for asylum, withholding of removal, and protection under the Convention Against Torture. Later that year, the Immigration Judge ("IJ") granted his application for asylum, which the Department of Homeland Security ("DHS") appealed to the Board of Immigration Appeals ("the BIA"). In 2020, the BIA vacated the IJ's decision for clear error and ordered Caballero-Vega's removal to Mexico. The following year, Caballero-Vega filed a petition for review in this court. We reverse the BIA's vacation of the IJ's decision and remand the case for further review.

## I.

Eight years after Caballero-Vega entered the United States, the San Francisco Immigration Court granted him the opportunity to depart the country voluntarily by 2005. However, Caballero-Vega remained in the United States, and the grant became a final order of removal.

Caballero-Vega became a criminal informant for the San Mateo County District Attorney in 2012. He reported to law enforcement on the drug, firearm, and human trafficking conducted by Nuestra Familia, a California prison gang, as well as the Norteño Gang, Nuestra Familia's "foot soldiers" in the streets. R. Vol. I at 143. Following his informant work, he testified against Nuestra Familia members in criminal court. Caballero-Vega was placed in a witness protection program during and after his testimony.

In January 2019, following his arrest in Colorado, Caballero-Vega was taken into immigration custody and removed to Mexico. On the day of his arrival, eight

2

armed men dressed in military clothing bearing the initials of the Cartel Jalisco Nueva Generación cartel ("CJNG") approached him in the street. They "demanded [his] identification paperwork, took pictures of his repatriation certificate, and . . . told [him] they would be back for him in the morning." *Id.* at 72. Caballero-Vega escaped and took a bus to Tijuana, Mexico, where he was again approached by eight men dressed in CJNG clothing. They "pushed [him] to the wall, asked who he was, and whether he was seeking asylum in the United States," before taking pictures of his repatriation certificate. *Id.* at 73. However, Caballero-Vega was able to escape again.

Caballero-Vega reentered the United States two months after leaving, presenting himself at a port of entry to apply for asylum, withholding of removal, and protection under the Convention Against Torture. Caballero-Vega alleged past persecution and a well-founded fear of persecution on account of his membership in particular social groups consisting of "informants who have testified in court against gangs" and "witnesses who have testified against gangs and come to the attention of the group they testified against." *Id.* at 3 (quotation marks omitted).

On November 13, 2019, the IJ granted Caballero-Vega's application for asylum, finding that he had established a well-founded fear of future persecution based on his membership in the group of "informants who have testified in court against gangs." *Id.* at 90. In reaching that conclusion, the IJ determined that "the evidence of the cooperation between the Norteño gang and Mexican cartels [is]

3

sufficient to establish the gang and cartel would be motivated to harm [Caballero-Vega] on account of being an informant and witness." *Id.* at 93.

DHS appealed the decision to the BIA. On December 15, 2020, the BIA sustained DHS's appeal, vacated the IJ's grant of Caballero-Vega's asylum, and ordered Caballero-Vega's removal to Mexico. Specifically, the BIA found that there was "clear error in the [IJ]'s finding that there's a reasonable possibility that [Caballero-Vega's] 2012 status as an informant and his 2013 or 2014 United States testimony against United States gang members will be a central reason for possible future harm to [him] upon removal to Mexico." *Id.* at 4. The BIA maintained that "the [IJ's] findings are speculative that [Caballero-Vega]—who was not threatened or harmed in the roughly seven years following his time as an informant and after having given testimony against United States gang members—would be persecuted by Mexican cartel members because he was an informant who testified against United States gang members." *Id.*

Caballero-Vega timely filed a petition for review in this court on January 14, 2021.

## II.

We review the BIA's "legal determinations de novo, and its findings of fact under a substantial-evidence standard." *Niang v. Gonzalez*, 422 F.3d 1187, 1196 (10th Cir. 2005) (citation omitted). Pursuant to 8 C.F.R. § 1003.1(d)(3)(i), the BIA may not engage in "de novo review of findings of fact determined by an [IJ]," but must review facts determined by the IJ for clear error. We have determined that

4

under the "rare circumstance[] . . . where an IJ makes factual credibility determinations which the BIA in turn rejects," we consider "de novo whether the BIA, in making its own factual findings, actually reviewed the IJ's decision only for clear error." *Kabba v. Mukasey*, 530 F.3d 1239, 1245 (10th Cir. 2008).

## III.

As a threshold matter, we first address the government's argument that we may not review Caballero-Vega's claim that the BIA exceeded the scope of its authority because he failed to initially present this claim to the BIA. The government provides scarce support for or explanation of this contention. We understand the government to be arguing that, on appeal, Caballero-Vega has challenged the standard of review actually applied by the BIA and, because he never presented this issue in a petition for rehearing or request for reconsideration with the BIA, it has not been preserved for our review.

We acknowledge that "[t]he failure to raise an issue on appeal to the BIA constitutes failure to exhaust administrative remedies with respect to that question and deprives the Court of Appeals of jurisdiction to hear the matter." *Rivera-Zurita v. I.N.S.*, 946 F.2d 118, 120 n.2 (10th Cir. 1991). Indeed, as we have previously held, the exhaustion requirement is derived from "a fundamental principle of administrative law that an agency must have the opportunity to rule on a challenger's arguments before the challenger may bring those arguments to court." *Garcia-Carbajal v. Holder*, 625 F.3d 1233, 1237 (10th Cir. 2010).

The government cites *Sidabutar v. Gonzales* to support its argument that Caballero-Vega's failure to raise his claim to the BIA about the scope of its authority renders that claim unreviewable before us.  *See* Resp't Br. at 34 (citing *Sidabutar v. Gonzales*, 503 F.3d 1116, 1122 (10th Cir. 2007) (holding petitioner's claim that the BIA exceeded scope of appellate review "should have been brought before the BIA in the first instance through a motion to reconsider or reopen" and, because it wasn't, "the petitioners[] failed to exhaust administrative remedies" on it)).  Although the government's characterization of *Sidabutar* is accurate, its application of *Sidabutar* to this case is not.  Sidabutar's appeal to the BIA challenged the IJ's finding that he was "ineligible for asylum based on [his] failure to comply with the application's one-year filing deadline." *Sidabutar*, 503 F.3d at 1119.  But, before this Court, he argued that the BIA had "improperly engaged in de novo factfinding in concluding [that he] did not suffer 'past persecution' for purposes of seeking a restriction on removal." *Id.* at 1118.  As Caballero-Vega correctly notes, whereas Sidabutar provided the BIA "no opportunity to address" the issue of its alleged de novo factfinding, Reply Br. at 2, he "has advanced the same legal theory throughout these proceedings," *id.* at 3.

Before the BIA, Caballero-Vega contended that the IJ's factual findings "are not 'clearly erroneous' simply because . . . [DHS] endorses a different view of the evidence."  R. Vol. I at 11 (citations omitted).  On appeal, his argument is the same: "Did the [BIA] . . . correctly apply the clear error standard where it reversed the Immigration Court's nexus finding because the [BIA] endorsed a different

6

interpretation of the evidence in the record?" Pet. Br. at 11. Caballero-Vega accuses the BIA of having "engaged in de novo reweighing of the evidence," *id.* at 17, but he has presented this as a criticism of the BIA's clear-error analysis, not an allegation that the wrong standard of review was used.

If Caballero-Vega were arguing that the BIA applied de novo review where only clear-error review was appropriate, our case law indicates he would have had to raise that issue to the BIA before we could hear it. However, Caballero-Vega is not alleging that the BIA used the wrong standard, but rather, that it wrongly concluded that the IJ clearly erred when it found that Caballero-Vega would face a reasonable possibility of future harm if he were removed to Mexico. Caballero-Vega's reference to "de novo reweighing" provides an example of what he views as the BIA's misapplication of the clear-error standard; it is not an assertion that the BIA applied a new and erroneous standard of review. *See Kabba*, 530 F.3d at 1244 (reviewing petitioner's argument that the BIA "committed legal error by analyzing the IJ's credibility determination de novo, rather than under the required clearly erroneous standard" without requiring a petition for rehearing or request for reconsideration). His brief clearly asserts the former argument. *See, e.g.*, Pet. Br. at 16–21 (analogizing to a Supreme Court case about whether a circuit court "properly applied the clearly erroneous standard of review to a petitioner's sex discrimination claim"). Caballero-Vega's argument that the BIA reached an erroneous conclusion using the clear-error standard of review was made before the BIA and need not have been

7

presented in a petition for rehearing or request for reconsideration for us to hear it on appeal.[2]

## IV.

Having established that we may properly review Caballero-Vega's claim that the BIA exceeded the scope of its authority, we now consider the merits of the claim. Because Caballero-Vega claims that the BIA improperly rejected the IJ's factual findings, we review the BIA's decision de novo. *See Kabba*, 530 F.3d at 1245. This means that we must evaluate whether the BIA has sufficiently justified its finding that the IJ's decision is clearly erroneous. *See id.* at 1245–49 (reviewing the BIA's

---

[2] The dissent argues that Caballero-Vega "never gave the BIA an opportunity to address" his claim that it incorrectly concluded that the IJ's factual findings were clearly erroneous; as a result, this Court lacks jurisdiction to consider Caballero-Vega's claim. Diss. op. at 1. However, there is a key distinction between this case and those cited by the dissent in which this Court found that it did not have jurisdiction because of a failure to exhaust administrative remedies. In this case, Caballero-Vega presented the same legal theory before the BIA that he makes before this Court—that the IJ's factual findings were not clearly erroneous. That is not true of the relevant cases the dissent cites. *See Garcia-Carbajal*, 625 F.3d at 1237–38 ("The only question [Garcia-Carbajal] presented for decision to the BIA was whether the immigration judge 'failed to engage in the [two step] analysis described in the BIA decision in *Silva-Trevino*.' . . . Before us, he has abandoned this particular legal theory entirely. Instead of challenging the *process* by which his case was analyzed, he now seeks to challenge the *substance* of the results it reached." (emphasis in original) (citation omitted)); *Sidabutar*, 503 F.3d at 1118, 1122 ("On appeal to the BIA, Sidabutar . . . argued that the IJ erred in concluding [he was] ineligible for asylum based on [his] failure to comply with the application's one-year filing deadline," but before this Court, Sidabutar made a "procedural challenge to the BIA's . . . finding that he failed to establish (1) past persecution, and (2) the unreasonableness of relocation to another part of Indonesia where the IJ made no such finding in the first instance." (internal quotation marks omitted)). The dissent would have Caballero-Vega ask the BIA to decide whether it conducted its own clear-error review correctly, but that is not required by *Sidabutar* or *Garcia-Carbajal*.

justifications for its finding and concluding that those justifications were clearly erroneous); *see also Wu Lin v. Lynch*, 813 F.3d 122, 129 (2d Cir. 2016) ("[D]e novo review does not mean that we can redetermine de novo whether we think the IJ has committed clear error. It means that we must determine whether the BIA has provided sufficient justification for its conclusion that the IJ has committed clear error. It also means that we must make sure that the BIA has not violated the prohibition against making its own findings of fact.")

Under 8 U.S.C. § 1158(b)(1), the Attorney General has the discretion to grant asylum to "refugees." A "refugee" includes a noncitizen who is "unable or unwilling to return to" his country "because of . . . a well-founded fear of persecution on account of . . . membership in a particular social group." *Id.* § 1101(a)(42)(A). "[P]ersecution may be inflicted by the government itself, or by a non-governmental group that 'the government is unwilling or unable to control.'" *Wiransane v. Ashcroft*, 366 F.3d 889, 893 (10th Cir. 2004) (citation omitted).

For a fear of persecution to be well-founded, there must be "'a reasonable possibility' that the alien would be persecuted upon removal to his country of nationality." *Jin Bin Wu v. Holder*, 481 F. App'x 427, 429 (10th Cir. 2012) (unpublished)[3] (quoting 8 C.F.R. § 1208.13(b)(1)). Even a ten percent chance of being persecuted may be sufficient to satisfy this standard. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987). However, because the well-founded fear of

---

[3] "Unpublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1 (2023).

persecution must be "on account of" membership in a particular social group, a petitioner must show the nexus between the harm the petitioner fears and his particular social group.  8 U.S.C. § 1101(a)(42)(A).  Whether such a nexus exists is a question of fact.

The IJ's analysis of the nexus between the harm Caballero-Vega fears and his particular social group is based on a substantial amount of evidence, including: a phone call from the Norteño gang members' attorney telling Caballero-Vega that "he had placed the . . . leaders of the Norteño gang . . . in a large amount of trouble," R. Vol. I at 92; the testimony of a former Senior Inspector with the San Mateo County District Attorney, who explained that Caballero-Vega "is still at risk from retaliation from . . . the Norteño gang as a whole," *id.*; opinions from U.S. law enforcement officials and gang experts indicating that "Mexican cartels . . . cooperate[] with the Norteño gang in exchanging intelligence, controlled substances, and weapons," *id.*; an official report from the California Attorney General finding that "California has seen increasing partnerships between transnational cartels and prison gangs," *id.* at 92–93; opinions from experts who "have classified th[e] cooperation between the cartels and American gangs as part of a criminal organization that all agree to help each other," and have further indicated that this cooperation "does not stop at simply the exchange of information," *id.* at 93; and "evidence that cartels beat and killed individuals associated with witnesses or cooperators with the government . . . [and] the Mexican government did next to nothing to investigate the crimes," *id.* (internal quotation marks and citations omitted).  Based on this evidence, the IJ concluded that

10

it was reasonable for Caballero-Vega to fear that Mexican cartels would harm him if they discovered he had testified against Norteño gang members. *See id.*

The BIA's review of the IJ's nexus finding is not substantiated nearly as well. The BIA notes that Caballero-Vega was not threatened or harmed when he was stopped in Mexico. *See id.* at 4. It observes that Caballero-Vega was also not "threatened or harmed in the roughly seven years following his time as an informant and after having given testimony against United States gang members." *Id.* Finally, it reasons that the IJ's "findings are speculative that [Caballero-Vega] . . . would be persecuted by Mexican cartel members because he was an informant who testified against United States gang members." *Id.*

We find insufficient the BIA's explanation for its finding that the IJ's decision is clearly erroneous. The fact that Caballero-Vega was not persecuted in Mexico is of little-to-no probative value here because he escaped before he could be identified by cartel members. Likewise, the fact that he was not threatened or harmed in the United States following his time as an informant is unhelpful because he was in witness protection for that entire period. Finally, the expert testimony cited by the IJ demonstrates that Mexican cartel members and United States gang members cooperate extensively, so the fact that Caballero-Vega testified against individuals based in the United States, not Mexico, is not dispositive. Thus, none of the reasons the BIA offers for vacating the IJ's decision justifies the BIA's finding of clear error.

We remand Caballero-Vega's case to the BIA to accept the IJ's decision or to provide further justification for its finding that the IJ's decision is clearly erroneous.

11

## V.

For the foregoing reasons, we REVERSE the judgment of the BIA of Immigration Appeals and REMAND for further proceedings consistent with this opinion.

Entered for the Court

Allison H. Eid
Circuit Judge

21-9506, *Caballero-Vega v. Garland*

**HOLMES**, C.J., Dissenting.

I respectfully dissent. Even if we assume—as the majority would have it—that Petitioner's argument complaining about the BIA's alleged de novo reweighing of the evidence amounts to no more than an attack on the BIA's application of the clear-error standard, rather than an argument that the BIA erred by applying a different standard of review altogether (i.e., de novo review), *see* Maj. Op. at 7, it is plain that Petitioner never gave the BIA an opportunity to address this attack, upon which he relies in seeking reversal. Contrary to the suggestion of the majority in footnote 2, Petitioner did have an obligation to give the BIA this opportunity—even if it meant filing a motion to reconsider or reopen. And, accordingly, he has failed to exhaust this argument, and we lack jurisdiction to consider it. *See Garcia-Carbajal v. Holder*, 625 F.3d 1233, 1237 (10th Cir. 2010) ("It is a fundamental principle of administrative law that an agency must have the opportunity to rule on a challenger's arguments before the challenger may bring those arguments to court."); *Rivera-Zurita v. I.N.S.*, 946 F.2d 118, 120 n.2 (10th Cir. 1991) ("The failure to raise an issue on appeal to the Board constitutes failure to exhaust administrative remedies with respect to that question and deprives the Court of Appeals of jurisdiction to hear the matter.").

It only serves to reason that this is so because at issue before the BIA was the quality of the *IJ*'s assessment of the facts. *See* Pet.'s BIA Br., Aplt.'s App. at 11 ("The *Immigration Judge's* finding that Caballero-Vega would be persecuted on account of his

membership in the particular social group was *not clearly erroneous*." (emphases added) (bold-face font omitted)). Yet on appeal here, Petitioner's argument zeros in the BIA's alleged failings in assessing the facts. *See* Aplt.'s Opening Br. at 11 ("Did the *Board of Immigration Appeals* correctly apply the clear error standard where it reversed the Immigration Court's nexus finding because the Board endorsed a different interpretation of the evidence in the record?" (emphasis added)). Indeed, the majority's own recounting of Petitioner's arguments before the BIA and our court reveals as much: *viz.*, it reveals that, before the BIA, the focus was the alleged failings of the IJ's factual analysis—an analysis that Petitioner defended—and, yet, before our court, the focus is on the alleged defects of the BIA's factual analysis—an analysis that Petitioner condemns. *See* Maj. Op. at 6–7.

The majority supports its reasoning in substantial part by citing *Kabba v. Mukasey*, 530 F.3d 1239 (10th Cir. 2008), where we restated the inquiry that the petitioner urged us to apply in this way: "[D]id the BIA commit possible legal error by reciting the clear error standard but actually applying a far less deferential standard of review to the IJ's credibility determinations, in which case we would review that application of law de novo." *Id.* at 1244. And we ultimately agreed with the petitioner and concluded thusly: "Although the BIA's opinion set forth the correct standard of review and recited a conclusion that the IJ's credibility findings were clearly erroneous, the BIA did not apply this deferential standard *in substance*." *Id.* at 1245 (emphasis added).

2

But this case is procedurally distinguishable from *Kabba* in one central respect—which explains why the *Kabba* panel could review the standard of review issue without confronting the obstacle of exhaustion, and we cannot review Petitioner's assumed attack on the BIA' application of the clearly erroneous standard.  Specifically, in *Kabba*, we considered the petitioner's appeal after the BIA had reversed the IJ's credibility determination—ostensibly, under a clearly erroneous standard—and remanded to the IJ to enter an order of removal.  *Id.* at 1243.  The IJ did so, and the petitioner appealed again to the BIA.  *See id.* at 1244.  Critically, in this agency appeal—not only did the BIA affirm and reincorporate its prior decision—but it explicitly addressed the question of whether it had correctly applied the clearly erroneous standard of review.  *See id.*  As we recounted: "The BIA also supplemented its prior decision by stating that *it did not engage in fact finding* in its first decision and that the IJ's credibility finding was clearly erroneous."  *Id.*  (emphasis added).

That was the procedural posture of *Kabba* when the petitioner appealed that BIA decision to us.  Unremarkably, under those circumstances, we reached the question in *Kabba* of whether the BIA correctly applied the clearly erroneous standard, without a hint of concern regarding whether this issue had been properly exhausted.  That is because it actually *had been exhausted*.  *See id.* at 1245; *see also Sidabutar v. Gonzales*, 503 F.3d 1116, 1118,  1122 (10th Cir. 2007) ("[B]ecause the BIA sufficiently *considered* Sidabutar's two unraised claims in its final order and that final order was properly

appealed in this petition for review, we assert jurisdiction over the matters *directly ruled on* by the BIA." (emphases added)).

But *Kabba*'s procedural circumstances bear no resemblance to those before us. Petitioner here never gave the BIA an opportunity to consider—much less rule on—his assumed challenge to the BIA's application of the clearly erroneous standard. In other words, he neither raised the issue in his BIA brief, nor did the BIA rule on the issue. Petitioner was obliged to put this issue before the BIA—even if it meant filing a motion to reconsider or reopen. *See Sidabutar*, 503 F.3d at 1122 (noting that the petitioner "should have brought [the unexhausted claims] before the BIA in the first instance through a motion to reconsider or reopen"). Therefore, Petitioner's argument comes to us unexhausted, and we have no jurisdiction to consider it.

Given that Petitioner's assumed challenge to the BIA's application of the clearly erroneous standard is unexhausted and thus unreviewable, the next step should be to apply the deferential substantial evidence standard to the BIA's factual nexus determination—a truth that even Petitioner recognizes. *See* Aplt.'s Opening Br. at 25 (arguing in the alternative that "[e]ven the deferential 'substantial evidence' standard does not support the Board's finding that Mr. Caballero-Vega's informant work and testimony would not be 'one central reason' for his persecution" (bold-face font omitted)). And under that deferential standard—which the majority's analysis elides—suffice it to say that a reasonable adjudicator would not be *compelled* to conclude that the BIA erred on the nexus determination. *See Uanreroro v. Gonzales*, 443 F.3d 1197, 1204

4

(10th Cir. 2006) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." (quoting 8 U.S.C. § 1252(b)(4)(B)); *Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005) (same); *cf.* Maj. Op. at 10 (making the observation—which would be insufficient for reversal under the deferential substantial evidence standard—that "[t]he Board's review of the IJ's nexus finding is not substantiated nearly as well" as the IJ's nexus analysis). Accordingly, I would uphold the BIA's judgment and deny the Petition for review.

For the foregoing reasons, I respectfully dissent.