**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-4313
_____

ABDUVAKHOB ABDUKAKHAROVICH ALIMBAEV,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,
                                        Respondent
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(BIA No. A079-729-904)
Immigration Judge: Honorable Charles M. Honeyman
_____

Argued: June 12, 2017

Before: JORDAN and KRAUSE, *Circuit Judges*,
and STEARNS, *District Judge*.[*]

_____

[*] The Honorable Richard G. Stearns, United States District Judge for the District of Massachusetts, sitting by designation.

(Opinion Filed: September 25, 2017)

Lawrence H. Rudnick     (Argued)
Rudnick Immigration Group
1608 Walnut Street
Suite 1700
Philadelphia, PA 19103

 *Counsel for Petitioner*

Chad A. Readler, Acting Assistant Attorney General Civil
Division
Ethan B. Kanter, Deputy Chief, National Security Unit
Melissa K. Lott
Jefferson B. Sessions, III.
Daniel I. Smulow (Argued)
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

 *Counsel for Respondent*

Ryan Houldin
Council on American-Islamic Relations
1501 Cherry Street
Suite 330
Philadelphia, PA 19102

 *Counsel for Amicus Petitioner*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

This disconcerting case, before our Court for the second time, has a lengthy procedural history marked by conflict between the Board of Immigrations Appeals (BIA) and the Immigration Judge (IJ) and fueled by troubling allegations that Petitioner, an Uzbek national, relished watching violent terroristic videos, while apparently harboring anti-American sympathies. The issue on appeal, however, is whether the BIA correctly applied the clear error standard of review, as required, when reviewing the IJ's factfinding in this case—an inquiry that highlights the role of faithful adherence to applicable standards of review in preserving the rule of law, safeguarding the impartiality of our adjudicatory processes, and ensuring that fairness and objectivity are not usurped by emotion, regardless of the nature of the allegations. Because we conclude that the BIA misapplied the clear error standard when reversing the IJ's finding that Petitioner's testimony was credible, we will grant the petition for review of the BIA's removal order, vacate the denial of Petitioner's applications for adjustment of status, withholding of removal, and protection under the Convention Against Torture (CAT), and remand once more to the BIA.

I. **Factual and Procedural Background**

Petitioner Abduvakhob A. Alimbaev is a native and citizen of Uzbekistan. According to his testimony before the

3

IJ,[1] when he was a young teenager in the early-to-mid 1990's, Alimbaev attended a handful of services led by Obidkhon Qori Nazarov, an imam who was accused by the Uzbek government—reputed for religious intolerance—of preaching violence and plotting a government takeover. During that time period, Uzbek authorities rescinded Nazarov's license to lead religious services, making it illegal for citizens to attend religious gatherings he hosted. According to Alimbaev, on a day Uzbek authorities came to Nazarov's apartment, Alimbaev was among a crowd of two- to three-hundred followers and reporters, all gathered to seek religious guidance and to prevent the government from surreptitiously arresting Nazarov. Alimbaev believes that when he was standing in the midst of the crowd, he was caught on video taken by authorities. It is because of his connections to Nazarov in Uzbekistan in the 1990's and to others who were followers of Nazarov in the United States after he came to this country in 2001, as described below, that Alimbaev claims to fear persecution and torture if he is removed to Uzbekistan.

Alimbaev testified that in February 2001, when he was nineteen, he traveled to the United States as a nonimmigrant visitor, planning to perform with an Uzbek band at a music festival in Los Angeles. Although Alimbaev was with some of his fellow band members in the Tashkent airport, he did not see them on his flight to New York City or upon arriving at the airport. Instead, according to Alimbaev, a girl from another

---

[1] This factual summary is derived principally from Alimbaev's testimony. *See, e.g.*, *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 211 n.1 (3d Cir. 2017); *Jishiashvili v. Att'y Gen.*, 402 F.3d 386, 388 (3d Cir. 2005).

4

Uzbek band informed him that his band members would not arrive until the following week. Afraid he would not have enough money to survive on his own for that week, Alimbaev decided to travel to Orlando, Florida to visit a friend from Uzbekistan whose name and phone number his father had given him to use in case of emergency, rather than continuing as planned to Los Angeles.

After a few months in Orlando and a brief stay in Dayton, Ohio, Alimbaev settled in Philadelphia, Pennsylvania. There, Alimbaev testified, he shared an apartment with six or seven Uzbek Muslim men, all of whom were supporters and former students of Nazarov. He also testified that not long after he moved into the apartment, Uzbek authorities came to Alimbaev's parents' house in Uzbekistan to inquire after Alimbaev's whereabouts and to pressure his parents to facilitate his return, displaying pictures of him with his new roommates in Philadelphia and accusing him of being "involved with these bad guys." AR 1297.

During this time, according to Alimbaev, he heeded warnings from his parents to stay in the United States by submitting applications to the then-called Immigration and Naturalization Service (INS)[2] to extend and change the status of his visa—applications that, it turned out, contained numerous misrepresentations. Initially, with the help of a friend, Alimbaev filed for and received an extension on his tourist visa through January 2002. That application falsely represented that Alimbaev was a computer scientist, that he

---

[2] In 2003, INS ceased to exist and its responsibilities were transferred to the Department of Homeland Security (DHS). *See* Homeland Security Act of 2002, 6 U.S.C. § 291.

5

had been invited to the United States by other computer scientists, and that his parents were wealthy and could support him for the duration of his stay. Alimbaev testified that he was unaware of the false statements in the application when it was submitted, though he acknowledged that it did contain his signature.

Later, when his visa was soon to expire in December 2001, Alimbaev applied to have his nonimmigrant status changed from tourist to student, representing in that application that he had been admitted to the Concord English Language Center in California and attaching a false tuition invoice as proof. Alimbaev testified that he was, once again, assisted by a friend in assembling this second application, but that he had no recollection of its contents or of actually submitting it to the INS. Although the application was denied as untimely, he remained in the country without authorization, continuing to live in the same apartment in Philadelphia.

In this communal residence, Alimbaev and his roommates occupied close quarters and shared just one computer, which, according to Alimbaev, he used only occasionally, typically to read international news. In June 2002, federal immigration agents executed a warrant at Alimbaev's apartment, arresting, detaining, and placing into immigration proceedings Alimbaev and five of his roommates, four of whom were the subject of extradition requests and Interpol warrants issued based on outstanding charges of religious extremism in Uzbekistan.[3] The agents searched the

---

[3] Our Court, in granting the petitions for relief later filed by Alimbaev's roommates, held that these charges were baseless and "a pretext to single out and punish those in

6

roommates' shared computer and discovered terroristic videos displaying Al Jazeera broadcasts—one of Osama bin Laden and one of Afghan fighters—images of Chechen rebel fighters, and scenes of destruction caused by explosives. The computer also contained a map of Pennsylvania State Police barracks and an email to one of Alimbaev's roommates praising an Islamic terrorist organization. After two months, Alimbaev was released from detainment, and charged with removability, which he conceded. Although removable, he soon became eligible to apply for adjustment of status based on two successive marital relationships.

In 2003, Alimbaev married Shaketa Chapman, a United States citizen whom he divorced in 2005. That December, he married his current wife, Kia Crawford, also a United States citizen, with whom, by the time of the hearing, he had had two children. Alimbaev supports his family financially through the construction business he owns and operates, and Crawford takes care of their children full time. Alimbaev also owns a house, and provides financial support to his mother-in-law.

In 2008, based on his marriage to Crawford, Alimbaev applied to adjust his status to lawful permanent resident, a request the Attorney General may grant or deny in his or her discretion by balancing the positive and negative factors relevant to a petitioner's application. 8 U.S.C. § 1255(a); *Matter of Edwards*, 20 I. & N. Dec. 191, 195 (BIA 1990); *see Zheng v. Gonzales*, 422 F.3d 98, 111 (3d Cir. 2005). At the subsequent hearing on Alimbaev's application, held before an IJ in 2010, Alimbaev testified that he did not watch violent

---

peaceful opposition to the authoritarian regime." *Yusupov v. Att'y Gen.*, 650 F.3d 968, 982 (3d Cir. 2011).

terroristic videos on his former roommates' shared computer, although he did view broadcasts downloaded from Al Jazeera, NBC News, and a Russian news channel that included coverage of Saddam Hussein and Osama bin Laden. Additionally, a government agent testified that none of the terroristic materials found on that computer were directly linked to Alimbaev's email account or tied in any traceable way to his usage of the computer. However, Alimbaev's ex-wife—who had by then changed her name to Shaketa Gonzalez—was called to testify as a rebuttal witness following Alimbaev's testimony, and she asserted that during their marriage, while they lived together in an apartment with no roommates, she witnessed Alimbaev view and express enthusiasm for violent videos depicting terrorist acts on multiple occasions.

Following the hearing, the IJ granted Alimbaev's application to adjust status. The Department of Homeland Security (DHS) appealed to the BIA, which vacated the IJ's decision, concluding the adverse factors present in Alimbaev's case outweighed the favorable equities. The BIA remanded, however, to afford Alimbaev the opportunity to apply for asylum—a form of discretionary relief, *see Guo v. Ashcroft*, 386 F.3d 556, 561 (3d Cir. 2004)—and withholding of removal and CAT protection—both of which are mandatory if eligibility is established, *see Kaita v. Att'y Gen.*, 522 F.3d 288, 296, 300-01 (3d Cir. 2008).

On remand, in addition to seeking these forms of relief, Alimbaev submitted a new application for adjustment of status. The IJ held a second hearing in 2014, at which Alimbaev repudiated Gonzalez's earlier testimony that he had watched violent videos of terrorist activity while they were married,

testifying that her statements were untrue and speculating that she was motivated by jealousy over his second marriage. After the hearing, the IJ granted Alimbaev's second application for adjustment of status, and, in the alternative, granted each additional form of relief he sought. The IJ credited Alimbaev's testimony both generally and specifically as to the violent videos, and found that in balancing the equities to adjudicate adjustment of status, Alimbaev, as well as his wife, children and mother-in-law (each of whom would remain in the United States),[4] would face hardship if he were deported.

At the outset of his second opinion, the IJ recounted in great detail Alimbaev's testimony at the second hearing, which he found credible overall "based on the totality of the circumstances," determining it to be "internally consistent, generally believable, and sufficiently detailed." AR 232. Specifically, the IJ highlighted as "candid" Alimbaev's "testimony that Shakeyta Gonzalez said things about him that were not true" and his testimony that "he never watched Al Qaeda videos or videos advocating violence against the United States." AR 229. On that basis, the IJ concluded that Gonzalez was "bias[ed]," that her testimony deserved little weight because it was uncorroborated by the DHS,[5] and that overall,

---

[4] Crawford noted that she and the children would not accompany Alimbaev to Uzbekistan because of his anticipated imprisonment and her inability to speak the language or to obtain employment there.

[5] Although Gonzalez testified that she had made contemporaneous reports about Alimbaev's interest in terroristic videos to her uncle who worked at the FBI and to others at the FBI, no written reports or other corroboration of

9

"the veracity and reliability of her testimony remain[ed] subject to doubt." AR 229. The DHS appealed again, and the BIA, reviewing the IJ's second decision, vacated that decision in its entirety, ordering Alimbaev's removal from the United States to Uzbekistan.

After Alimbaev petitioned our Court for review of that BIA decision and removal order, the Government promptly filed an unopposed motion to remand, seeking to allow the BIA to reconsider its decision in multiple respects, including the effect of the IJ's credibility findings on Alimbaev's applications for relief. We granted the motion, returning Alimbaev's case to the BIA for the third time.

In 2016, the BIA vacated its prior decision and re-adjudicated Alimbaev's claims. First, it reversed the IJ's positive credibility determination regarding Alimbaev's testimony as clearly erroneous and credited Gonzalez's testimony regarding the violent videos. In addition, the BIA held that Alimbaev's application for asylum was time-barred,[6] and his applications for withholding of removal and CAT protection were meritless in light of Alimbaev's incredible

---

such conversations were offered by the Government at any point in these immigration proceedings.

[6] Alimbaev conceded at oral argument that, under 8 U.S.C. § 1158(a)(2)(B), his application for asylum was untimely, and that we lack jurisdiction to review the BIA's discretionary determination that he is ineligible for the "changed circumstances" exception to that statutory bar, *id.* § 1158(a)(2)(D); *see* 8 C.F.R. § 1208.4(a)(4); *Sukwanputra v. Gonzales*, 434 F.3d 627, 635 (3d Cir. 2006). Thus, we will not further address Alimbaev's application for asylum.

testimony. The BIA also held that the IJ lacked jurisdiction to review Alimbaev's second application for adjustment of status. In the alternative, it addressed the application's merits, reversing the IJ's finding that Alimbaev himself would suffer hardship upon being removed to Uzbekistan and declining, in its discretion, to adjust Alimbaev's status to legal permanent resident. Having denied all of Alimbaev's claims, the BIA once again ordered his removal.

Alimbaev now petitions this Court for review of the November 18, 2016 removal order of the BIA, asserting that the BIA erred in rejecting the IJ's credibility determination. For the reasons that follow, we conclude the BIA failed to properly apply the clear error standard of review when it overruled the IJ's credibility finding, necessitating yet another remand for reconsideration of Alimbaev's applications for adjustment of status, withholding of removal, and CAT protection.

## II.     Jurisdiction and Standard of Review

Although we have jurisdiction over removal orders of the BIA under 8 U.S.C. § 1252(a), *see Cruz v. Att'y Gen.*, 452 F.3d 240, 246 (3d Cir. 2006), we lack jurisdiction to review the BIA's discretionary weighing of evidence, *see Pieschacon-Villegas v. Att'y Gen.*, 671 F.3d 303, 310 (3d Cir. 2011), or the BIA's denial of discretionary relief, including applications for adjustment of status, *see* 8 U.S.C. §§ 1252(a)(2)(B)(i), 1255; *Pareja v. Att'y Gen.*, 615 F.3d 180, 186 (3d Cir. 2010). However, even when presented with these discretionary decisions, we may review "colorable claims or questions of law," *Pareja*, 615 F.3d at 186 (quotation marks and citation omitted); *see* 8 U.S.C. § 1252(a)(2)(D), such as whether the

11

BIA "misapplied the legal standard," *Pieschacon-Villegas*, 671 F.3d at 310. And, of course, when our jurisdiction is unclear, "[w]e have jurisdiction to determine whether we have jurisdiction." *Jarbough v. Att'y Gen.*, 483 F.3d 184, 188 n.3 (3d Cir. 2007).

As for what standard we apply, we review the BIA's legal determinations de novo, including whether the BIA properly applied clear error review to the IJ's findings of fact. *Mendoza-Ordonez v. Att'y Gen.*, No. 16-3333, 2017 WL 3611991, at *4 (3d Cir. Aug 23, 2017); *Pieschacon-Villegas*, 671 F.3d at 310, 314; *see Lin v. Lynch*, 813 F.3d 122, 129 (2d Cir. 2016); *Kabba v. Mukasey*, 530 F.3d 1239, 1245 (10th Cir. 2008). Where, as here, the BIA issues its own opinion on the merits, we review that decision, not the IJ's.[7] *Cadapan v. Att'y Gen.*, 749 F.3d 157, 159 (3d Cir. 2014).

---

[7] The Government takes no position regarding the BIA's holding that the IJ lacked jurisdiction to adjudicate Alimbaev's second application for adjustment of status, positing that we need not address this question because the BIA, in the alternative, considered and denied Petitioner's second application on the merits. However, because we must ensure that we review the correct BIA opinion, which turns on which adjustment application the IJ had jurisdiction to adjudicate, *see Cadapan v. Att'y Gen.*, 749 F.3d 157, 159 (3d Cir. 2014), we pause to clarify the IJ's jurisdiction.

We have held that when the BIA does not expressly retain jurisdiction over a petitioner's case and issues a remand order unlimited in scope and purpose, an IJ has jurisdiction to consider any matters pertinent to that case under the

## III.    Discussion

The central question in this case is whether the BIA misapplied the clearly erroneous standard in rejecting the IJ's finding that Alimbaev's testimony was credible. We conclude that it did err and that this error necessitates remand to the BIA

Immigration and Nationality Act (INA) and its implementing regulations. *Johnson v. Ashcroft*, 286 F.3d 696, 702-03 (3d Cir. 2002) (holding that unless remand from the BIA is "qualified or limited to a specific purpose," an IJ may consider "any and all matters [he] . . . deem[s] appropriate in the exercise of his administrative discretion or which are brought to his attention in compliance with the appropriate regulations") (quoting *Matter of Patel*, 16 I. & N. Dec. 600, 601 (BIA 1978)). Here, the BIA employed the following language in its first decision: "Because the respondent . . . indicated a desire to apply for asylum, withholding of removal, and [CAT] protection . . . we [] remand the record to provide him the opportunity to apply for that relief or any other relief for which he may be eligible." AR 967. Clearly, the BIA neither retained its own jurisdiction nor placed limits on the scope or purpose of its remand order, *see Johnson*, 286 F.3d at 702-03, going so far as to spell out that Alimbaev was at liberty to apply for additional forms of relief beyond asylum, withholding of removal, and CAT protection. Additionally, the INA does not confine the number of applications a petitioner may file. *See* 8 U.S.C. § 1255. Thus, we have no difficulty concluding the IJ had jurisdiction over Alimbaev's second adjustment application, and therefore we review the BIA's analysis of that application as set forth in the BIA's third and most recent opinion and order, which is the subject of this appeal. *See Cadapan*, 749 F.3d at 159.

13

of Alimbaev's applications for adjustment of status, withholding of removal, and CAT protection because the BIA's analysis of the merits of each form of relief was affected by its reversal of the IJ's credibility determination. To explain how we arrive at this conclusion, we begin by situating the clearly erroneous standard in the context of credibility determinations; we then address how the BIA misapplied this standard by reversing the IJ's credibility finding; and we close by explaining the implications of our holding in order to define with clarity the BIA's task on remand. We start with the clearly erroneous standard.

### A. The Clearly Erroneous Standard of Review of Credibility Determinations

The Supreme Court explicated the concept of clear error review in *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948), the seminal case for defining this standard, including in the immigration context. *See, e.g.*, *Lin*, 813 F.3d at 126; *Kabba*, 530 F.3d at 1245. In *Gypsum*, the Court held that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Gypsum*, 333 U.S. at 395. Since *Gypsum*, the Court has acknowledged that "the meaning of the phrase 'clearly erroneous' is not immediately apparent." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985). Nevertheless, the Court has set forth certain defining principles, including that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," *id.* at 574, and that, where the disputed finding of fact is a credibility finding, "even greater deference" is owed, "for only the [factfinder] can be aware of the variations in demeanor and

14

tone of voice that bear so heavily on the listener's understanding of and belief in what is said," *id.* at 575. In short, "[t]his standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Id.* at 573.

These teachings apply with particular force when the BIA reviews an IJ's credibility finding in immigration proceedings because a petitioner's testimony, in many cases, is the singular evidence that establishes, or, conversely, disproves that petitioner's case. *See Chukwu v. Att'y Gen.*, 484 F.3d 185, 191 (3d Cir. 2007) ("[T]he BIA may grant . . . [relief] solely on the basis of the applicant's credible testimony."). The INA, by its terms, grants IJs broad discretion in making credibility determinations, providing that: "Considering the totality of the circumstances, and all relevant factors," an IJ "may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between . . . written and oral statements . . . , the internal consistency of each such statement, the consistency of such statements with other evidence of record . . . , and any inaccuracies or falsehoods in such statements," whether or not "an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii). Although that subsection applies specifically to asylum applications, we have recognized previously that the wide latitude that it affords an IJ—in considering all pertinent factors and weighing those factors as the IJ deems appropriate in each individual case—carries over to other applications for relief. *See, e.g.*, *Sukwanputra v. Gonzales*, 434 F.3d 627, 636 (3d Cir. 2006).

15

In view of that broad latitude and factfinding authority, the BIA's review of an IJ's factfinding is highly deferential. *See In Re S-H-*, 23 I. & N. Dec. 462, 464-65 (BIA 2002). The BIA is prohibited from "engag[ing] in de novo review of findings of fact determined by an immigration judge," and instead, "[f]acts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed [by the BIA] only to determine whether the findings of the immigration judge are clearly erroneous." 8 C.F.R. § 1003.1(d)(3)(i). The Board must "start from the premise that it will accept the findings of fact made by the immigration judge," and it may only reject them if it "identifies specific reasons . . . for forming a definite and firm conviction that a mistake has been made." Board of Immigration Appeals: Procedural Reforms To Improve Case Management, 67 Fed. Reg. 54878-01, 54889 (Aug. 26, 2002). Merely pointing to another permissible view of the evidence is insufficient. *In Re J-Y-C-*, 24 I. & N. Dec. 260, 263 (BIA 2007). If further factfinding is needed, the Board must remand the proceeding to an immigration judge. 8 C.F.R. § 1003.1(d)(3)(iv). Moreover, the BIA's review of the record "must reflect a meaningful consideration of the record as a whole. It is not enough for the BIA to select a few facts and state that, based on them, it disagrees with the IJ's conclusion." *Huang v. Att'y Gen.*, 620 F.3d 372, 387 (3d Cir. 2010).

When we, in turn, are called upon to review the BIA's acceptance of an IJ's factfinding, we carefully consider whether the BIA has adhered to its obligation to apply the clear error standard and whether it has applied that standard consistently. When the BIA has adopted the IJ's findings as being supported by substantial evidence, we will likewise

uphold those findings "to the extent that they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Abdulrahman v. Ashcroft*, 330 F.3d 587, 597 (3d Cir. 2003); *see also Mendoza-Ordonez*, 2017 WL 3611991, at \*5. And when our Court is called to evaluate an IJ's credibility determination that has been adopted by the BIA, we do so with exceptional deference, recognizing that the IJ "alone is in a position to observe an alien's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence." *Abdulrahman*, 330 F.3d at 597. Stated differently, we view the IJ as being "uniquely qualified to decide whether an alien's testimony has about it the ring of truth," and our deferential review is built to reflect this principle. *Id.*

Where the BIA rejects an IJ's findings, however, we carefully scrutinize its reasoning to determine whether the BIA has overstepped these bounds and misapplied the clear error standard by "ignoring evidence relevant to determining" the merits of a petitioner's claim, *Pieschacon-Villegas*, 671 F.3d at 310, failing "to supply cogent reasons for its rulings," *Lin*, 813 F.3d at 129, "substitut[ing] its own judgment for that of the IJ," *Kabba*, 530 F.3d at 1247, or failing to "defer to the IJ's findings," *id.* In those circumstances, we will grant a petition for review and remand for appropriate proceedings.

Such is the case here. Below, we identify each of the BIA's missteps, explaining why its reversal of the IJ's credibility finding reflects legal error.

> *B.* *BIA Review of Alimbaev's Testimony*

17

In this case, the IJ found that Alimbaev's testimony was "candid[]," AR 232, "internally consistent, generally believable and sufficiently detailed to provide [the IJ] with a 'plausible and coherent account.'" AR 232 (quoting *Matter of Dass*, 20 I. & N. Dec. 120, 124 (BIA 1989)). On the basis of that credible testimony, much of which was otherwise uncorroborated, the IJ concluded that Alimbaev was entitled to an adjustment of status, or in the alternative, withholding of removal or CAT protection. The BIA, however, reversed that credibility finding, purporting to apply the clearly erroneous standard and finding clear error based on three aspects of Alimbaev's testimony: (1) two inconsistencies; (2) the circumstances of his entry to the United States; and (3) Alimbaev's alleged failure to rebut his ex-wife's testimony that he watched terroristic videos. We consider these three issues below.

### 1. Inconsistencies

We have observed that it would be improper for an IJ, much less the BIA, to discount entirely otherwise-credible testimony based solely on an "excessive focus on insignificant testimonial inconsistencies to support a finding of lack of credibility," *Chen v. Gonzales*, 434 F.3d 212, 220 (3d Cir. 2005), and that the credibility of a witness must be considered *in toto* because the IJ's "overall credibility determination does not necessarily rise or fall on each element of the witness's testimony, but rather is more properly decided on the cumulative effect of the entirety of all such elements," *Jishiashvili v. Att'y Gen.*, 402 F.3d 386, 396 (3d Cir. 2005). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," *Anderson*, 470 U.S. at 574, and the BIA's review of any

18

inconsistencies must be based on "meaningful consideration of the record as a whole," *Huang*, 620 F.3d at 387.

Here, however, the BIA homed in on two small inconsistencies in Alimbaev's testimony. First, the BIA deemed Alimbaev's testimony to be "internally inconsistent" because, although he testified that his parents informed him in August 2001 that Uzbek authorities had come to their house and questioned them about his relationship with his roommates in Philadelphia, he testified at another point that he did not move to Philadelphia until October 2001. AR 5. When asked about the discrepancy in dates, Alimbaev testified that it was merely a mistake, reiterating that the conversation between Uzbek authorities and his parents did take place and that it took place after he moved to Philadelphia. The IJ, in his second opinion, noted Alimbaev's acknowledgment that he confused these dates but offered no additional analysis on this point. Second, the BIA took issue with the fact that, in the first hearing, Alimbaev testified that he attended Nazarov's mosque two to three times, whereas in the second hearing, he testified that he attended the mosque six to eight times. The IJ did not address this minor change in testimony, merely noting in his opinion that Alimbaev had previously attended the mosque, but was not a member.

Although identified by the BIA as central reasons for its rejection of the IJ's credibility finding, the two statements at issue appear to be no more than "insignificant testimonial inconsistencies," *Chen*, 434 F.3d at 220, that would probably not, standing alone, justify an IJ in making a general adverse credibility finding, much less justify the BIA in rejecting a positive credibility finding under a clear error standard. Thus, the BIA substituted its view for the IJ's "permissible" view that

19

Alimbaev's overall credibility was not thereby undermined. *Anderson*, 470 U.S. at 574. While Alimbaev's ability to recall specific numbers and dates may have been imperfect—and the number of times he attended Nazarov's mosque does bear on his affiliation with Nazarov, with potential implications for Alimbaev's likelihood of persecution and torture relevant to his claims for withholding of removal and CAT protection, *see Kaita*, 522 F.3d at 296, 300—the IJ could reasonably credit Alimbaev's explanations and allow some leeway in his estimates of how many times he attended the mosque as a teenager nearly a decade earlier. In holding otherwise, the BIA jettisoned "consideration of the record as a whole," *Huang*, 620 F.3d at 387, demonstrated "excessive focus on insignificant testimonial inconsistencies to support a finding of lack of credibility," *Chen*, 434 F.3d at 220, and substituted its own view of the facts in place of the IJ's "permissible" view, *Anderson*, 470 U.S. at 574.

2. Circumstances of Alimbaev's Entry to United States

The BIA's second ground for rejecting the IJ's credibility finding was its determination that Alimbaev's "testimony concerning the basis and circumstances of his entry into the United States" was "implausible" and his explanations "inherently improbable." AR 6. The IJ did not expound on this issue, merely stating as a part of his review of Alimbaev's application for adjustment of status: "As previously noted, the Court considers the circumstances surrounding Respondent's admission and I-539 applications and the testimony of his ex-wife disturbing and negative, but not sufficient to cumulatively outweigh the positive equities in his case." AR 228-29.

20

As noted by both the IJ and the BIA, Alimbaev's explanation for his entry into the United States—that he lost his bandmates somewhere between the Tashkent airport and New York City and then abandoned his travel plans to Los Angeles in favor of visiting a friend in Orlando—appears implausible. Likewise, Alimbaev's false statements on his applications to extend and change his status are disturbing, notwithstanding his explanations that he relied on others to complete those applications. But the question is not whether these circumstances were problematic negative factors; the IJ acknowledged that they were and counted them as "disturbing and negative" in reaching his conclusion. AR 229.

The question, instead, is whether the BIA, reviewing only for clear error, was entitled to set aside the IJ's credibility findings and, hence, to disregard the testimony on which the IJ relied to conclude that Alimbaev feared persecution and torture if deported and that Alimbaev's removal would result in hardship for his family. *See Jishiashvili*, 402 F.3d at 396. It was not. As the IJ "alone is in a position to observe an alien's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence," *Abdulrahman*, 330 F.3d at 597, and here the IJ did so after hearing extensive testimony over the course of two hearings, the IJ's credibility finding was not "[im]plausible in light of the record viewed in its entirety," and therefore was not clearly erroneous, *Anderson*, 470 U.S. at 574.[8]

_____

[8] We are not suggesting that the spoken word will always trump other aspects of a record that may indicate a lack of credibility. It is certainly possible that a record could appropriately leave the BIA with a definite and firm conviction

### 3. Rebuttal Testimony

The third basis that the BIA identified for rejecting the IJ's credibility determination was that because "the respondent did not specifically rebut [Gonzalez's] testimony in either 2010, or on remand in 2014, the [IJ] clearly erred in questioning the reliability of [Gonzalez's] account of the events and assigning her testimony limited weight." AR 11. In addition, the BIA asserted that the IJ "did not make an adverse credibility finding with respect to [Gonzalez]," AR 10, and because the IJ did not make that finding—instead stating only that Gonzalez's testimony "deserved limited weight" because it was "biased" and uncorroborated, AR 229, and that "the veracity and reliability of her testimony remains subject to doubt," AR 229—the BIA could simply consider the contradictory testimony as one factor in its discretionary determination of adjustment of status—a determination this Court lacks jurisdiction to review. 8 U.S.C. § 1252(a)(2)(B).

The BIA's reasoning, however, rests entirely on a false premise. Alimbaev did, in fact, rebut Gonzalez's testimony that he watched "homemade" videos depicting violence against U.S. military members several times a week, AR 1469–70, by testifying in 2014 that he accessed websites to watch news videos but "never saw" videos depicting violence against U.S. forces, AR 335. Moreover, the IJ, after carefully considering

---

that an IJ has made a mistake about credibility, even in the face of the IJ's finding that a petitioner's testimony was truthful. Our point here is simple: on this record, the BIA overreached to sustain this particular result, and that was in derogation of its responsibility to apply the clearly erroneous standard in its review of the IJ's findings.

22

the divergent accounts of the two witnesses, explicitly found that Alimbaev's testimony refuting Gonzalez's account was "candid," AR 229, and his testimony was overall "credible," AR 232. By necessary implication, the IJ made an adverse credibility finding as to Gonzalez's testimony, and the Government points to no authority suggesting either that an IJ must pronounce particular "magic words" in making its credibility findings or that an implicit credibility finding is entitled to any less deference than an explicit one.

Also troubling, the BIA described the IJ as discounting "evidence from the respondent's ex-wife establishing that the respondent regularly used a computer to watch videos of terrorist activity . . . as well as evidence that a computer was recovered at the residence containing such material." AR 10. Notwithstanding the BIA's insinuation, however, the videos in question were not found on any computer in the marital residence and thus did not provide any corroboration for Gonzalez's testimony. Rather, the videos were found on the communal apartment computer that Alimbaev shared with his roommates prior to his marriage to Gonzalez—a computer that, as Alimbaev explained, he used only on occasion, and then only to watch the news.[9]

---

[9] This Court also had occasion to consider the nature of those videos in *Yusupov v. Att'y Gen.*, 650 F.3d 968 (3d Cir. 2011), where we pointed out that "none of the videos were 'training materials,' . . . several of the videos, including that of bin Laden, originated from Al Jazeera, a recognized news source," and that on the whole, the computer "did not produce any direct or causal link suggesting that [they] espoused violence, such as email messages of a questionable nature." *Id.* at 985, 987.

In sum, the BIA's characterization of the record appears inaccurate and reflects a decision to "ignor[e]" evidence crucial to Alimbaev's case and contrary to the BIA's preferred outcome, *Kabba*, 530 F.3d at 1247, effectively reweighing the testimony and engaging in the very "de novo review of findings of fact determined by an immigration judge" that is prohibited by regulation, 8 C.F.R. § 1003.1(d)(3)(i). Neither singly nor in combination are the three grounds identified by the BIA "sufficient justification for its conclusion that the IJ has committed clear error." *Lin*, 813 F.3d at 129. For that reason, remand is appropriate for the BIA to reconsider Alimbaev's applications for relief.

### C. *Implications on Remand*

We turn, next, to the scope of remand and, specifically, to how reinstatement of the IJ's credibility findings may affect Alimbaev's claims for adjustment of status, withholding of removal, and CAT protection.

#### 1. Adjustment of Status

As we lack jurisdiction to review the BIA's discretionary decision whether to grant Alimbaev's adjustment application and the balancing of the positive and negative factors that underlie it, we only review the BIA's application of the clear error standard to the IJ's factual findings. Based on that review, we will remand as to Alimbaev's application for adjustment of status only for the BIA to accept the IJ's credibility determination to which it should have deferred

24

when performing that balancing. *See Jarbough*, 483 F.3d at 188; *Matter of Edwards*, 20 I. & N. Dec. at 195.[10]

---

[10] Alimbaev also raises multiple arguments on appeal pertaining to the BIA's adjustment of status analysis that we lack jurisdiction to review. First, Alimbaev asserts that the BIA engaged in independent factfinding when it counted inaccuracies in his immigration applications against him in its balancing of the equities. However, the IJ credited Alimbaev's testimony that he was unaware of the misrepresentations in the submitted documents, describing the circumstances surrounding the applications as "disturbing and negative, but not sufficient to cumulatively outweigh the positive equities in this case," AR 228-29, and the BIA "accept[ed] the [IJ's] finding that the respondent lacked actual knowledge of the inaccuracies" in the applications, merely considering these inaccurate applications as a discretionary adverse factor. AR 12. The BIA thus adopted and relied on the IJ's factual findings and assigned greater significance to the inaccurate immigration applications when adjudicating Alimbaev's application for adjustment of status than did the IJ. The BIA was well within its rights to do so, and we do not review that discretionary decision. *See Pareja*, 615 F.3d at 186. In addition, Alimbaev suggests the agency was required to forego its exercise of discretion, disregard all negative equities, and grant Alimbaev's application for adjustment because of his status as the immediate relative of a United States citizen. Petitioner's Br. 33-34 (citing *Matter of Battista*, 19 I. & N. Dec. 484 (BIA 1987); *Matter of Cavazos*, 17 I. & N. Dec. 215, 217 (BIA 1980)). Again, the BIA is entitled to assign the weight it sees fit to adjustment factors like a petitioner's familial status, and its subsequent balancing of those factors is beyond the

25

Alimbaev's credibility informs two factors that the BIA considered in its discretionary balancing. First, it affected the BIA's assessment of whether Alimbaev and his family would face hardship if Alimbaev returned to Uzbekistan. The IJ had identified hardship as a positive factor because he found—based solely on Alimbaev's testimony—that Alimbaev's removal would present hardship to his family because "it is likely that the Uzbek government will arrest and detain" Alimbaev, making him unable to work, and it would present hardship to Alimbaev himself "in light of the risk of arbitrary arrest, detention, and torture that he would face in his home country based upon his ardent practice of Islam, his association with Imam Nazarov, and his association with his former roommates." AR 230-31. Because the BIA deemed Alimbaev's testimony incredible, it perceived no factual support for the IJ's determination of hardship and omitted hardship as a positive factor in its own adjustment of status balancing.

Second, as discussed at length above, while the IJ did not consider Alimbaev's alleged viewing of terroristic videos to be a negative factor because he credited Alimbaev's testimony over that of Gonzalez, the BIA, as a result of its rejection of the IJ's explicit credibility finding as to Alimbaev and implicit credibility finding as to Gonzalez, did consider it a negative factor.

On remand, the BIA must reconsider those factors with due deference to the IJ's factfinding before weighing the

_____

purview of our jurisdiction to consider. *See Pareja*, 615 F.3d at 186.

various positive and negative factors to make its ultimate discretionary decision on adjustment of status.

## 2.  Withholding of Removal and CAT Protection

The BIA's error in its standard of review also affected Alimbaev's applications for withholding of removal and CAT protection.  The IJ determined that Alimbaev made the required showing for withholding of removal—*i.e.*, that it was "'more likely than not' that [Alimbaev's] life or freedom would be threatened if returned to" Uzbekistan because of his religion or membership in a particular social group, *Kaita*, 522 F.3d at 296—and for CAT protection—*i.e.*, that it was more likely than not that he would be tortured in Uzbekistan "with the consent or acquiescence of a public official or other person acting in an official capacity," *id.* at 300—through his testimony that he feared "being arrested, detained, and tortured in Uzbekistan based upon his appearance, his ties to . . . Nazarov, and his association with his former roommates," AR 232-33.  Additionally, the IJ determined that Alimbaev's explanation for his failure to offer any corroboration from friends and family, while credible only in part and resulting in an "evidentiary gap"—was not so troubling as to overcome the strength of Alimbaev's other testimony, AR 235, ruling that his testimony that he feared "being arrested, detained, and tortured in Uzbekistan based upon his appearance, his ties to . . . Nazarov, and his association with his former roommates," was credible.  AR 232-33.

But having discredited the only evidence supporting those rulings—Alimbaev's testimony—the BIA necessarily reached a different outcome.  Accordingly, remand is required to allow the BIA, adopting the IJ's credibility finding and

27

considering both Alimbaev's testimony and the "evidentiary gap" the IJ acknowledged in the lack of corroboration,[11] to reassess Alimbaev's applications for withholding of removal and CAT protection.

**IV.    Conclusion**

For the foregoing reasons, we will grant Alimbaev's petition for review of the BIA's order of removal, vacate that order to the extent that it denied Alimbaev's applications for adjustment of status, withholding of removal, and protection under CAT, and remand to the BIA for proceedings consistent with this opinion.

---

[11] Although a petitioner's testimony alone may be sufficient to sustain his burden of proof, we recognize that "failure to produce corroborating evidence may undermine a petitioner's case where (1) the IJ identifies facts for which it is reasonable to expect the applicant to produce corroboration, (2) the applicant fails to corroborate, and (3) the applicant fails to adequately explain that failure." *Chukwu*, 484 F.3d at 192 (citing *Toure v. Att'y Gen.*, 443 F.3d 310, 323 (3d Cir. 2006)).