NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1999
_____

JETON SUTAJ,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,
                                        Respondent
_____

On Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A206-789-785)
Immigration Judge: Honorable Mirlande Tadal
_____

Argued January 8, 2018

Before:   JORDAN, ROTH, *Circuit Judges* and STEARNS*, *District Judge.*

(Filed: January 31, 2018)

Marcela Gyires          [ARGUED]
Pozo Goldstein
2000 South Dixie Highway, Suite 101
Miami, FL 33133
        *Counsel for Petitioner*

_____

        * Honorable Richard G. Stearns, United States District Court Judge for the District
of Massachusetts, sitting by designation.

Chad A. Readler
*Acting Assistant Attorney General*

Stephen J. Flynn
*Assistant Director*
*Office of Immigration Litigation*

James A. Hurley      [ARGUED]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878, Room 5009
Ben Franklin Station
Washington, D.C. 20044
        *Counsel for Respondent*

_____

OPINION**
_____

STEARNS, *District Judge*.

Petitioner Jeton Sutaj, an Albanian national, challenges a ruling of the Board of Immigration Appeals (BIA) upholding an Immigration Judge's determination that he is ineligible for relief under the Convention Against Torture (CAT)[1]. We find no error and therefore deny the petition.

## I.  Background

---

** This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

[1] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.

Sutaj attempted to enter the United States on March 4, 2015, at John F. Kennedy Airport in New York using a counterfeit Italian passport.[2] He was intercepted by officers of the Department of Homeland Security (DHS), who eventually ascertained Sutaj's true identity and nationality. He subsequently pled guilty to the false use of a passport in violation of 18 U.S.C. § 1546, for which he received a six-month prison sentence. After Sutaj's release from custody, DHS initiated removal proceedings. Represented by counsel, Sutaj sought asylum, withholding of removal, and protection under CAT.

Sutaj claims that he had worked "as [a] soldier of [the] Guard[] of [the] Republic of Albania," which, among other duties, provides security for the country's Prime Minister and President. (AR at 593). Sutaj maintains that he was recruited by a local police chief (Dritan Lamaj), as an undercover operative. In that capacity, he spent several years participating in an investigation of Arben and Mark Frroku, two Albanian brothers who are the alleged masterminds of a far-flung criminal enterprise involving prostitution and drug trafficking. According to Sutaj, the brothers were at the time wanted for murder in Belgium. Over the course of the investigation – in which he secretly recorded personal and telephone conversations – Sutaj claims that on several occasions he was present when the Frroku brothers met with high-ranking Albanian government officials. Although the details are sketchy, Sutaj claims that the meetings

---

[2] Sutaj was attempting to take advantage of the expedited admissions procedure offered to citizens of certain specified countries under the Visa Waiver Program (VWP). Italian citizens are eligible; Albanian citizens are not.

included discussions of money laundering and promises of senior government positions for members of the Frroku crime syndicate.

Before the Immigration Judge (IJ), Sutaj testified that, in December of 2012, he was driving with Lamaj from a stakeout of the Frroku brothers, when their vehicle was blocked by a Mercedes SUV. Sutaj recognized the occupants of the SUV as members of the Frroku brothers' security entourage. The security guards emerged from the SUV pointing pistols and machine guns at Lamaj and Sutaj, although Lamaj managed to speed off, allowing the two men to escape unharmed. Sutaj continued his work for Lamaj until January of 2013, when Lamaj told him that he had been ordered by two senior police officials to turn over his files on the Frroku brothers. He also informed Sutaj that the officials had inquired into Sutaj's identity. At Lamaj's urging, Sutaj took refuge in Iballë, his native village near Pukë in northern Albania.

On February 24, 2013, Sutaj learned that Lamaj had been assassinated by one of the Frroku brothers. Over the next two years, Sutaj came to believe that his life was increasingly at risk because several times "some luxury car with unknown persons came to the . . . village . . . and they were asking if anybody knows a boy with the name Jeton[]." (AR at 252). He also became convinced that persons associated with the Frroku brothers had learned his identity from Lamaj's secret files.

According to Sutaj, he remained in hiding in Pukë between 2013 and 2015, although he admits to having made trips to Italy and to Montenegro using his Albanian passport. At one point after Lamaj's death, while driving to visit his sister, a small car blocked his way and its three occupants began shooting at him, although Sutaj escaped

4

unscathed. He claims to have reported the incident to local police, but did not mention his suspicion of a connection with the Frroku brothers for fear that the police were on their payroll. Instead he fled Albania in 2015, setting his sights on the United States.

The IJ held an initial merits hearing on February 8, 2016. Sutaj, speaking through an Albanian translator, testified consistent with what is set out above. The IJ issued her first ruling on March 8, 2016, denying Sutaj's requests for asylum, withholding of removal, and CAT protection. The IJ found Sutaj's testimony to be credible, despite some inconsistencies,[3] but denied his asylum and withholding of removal requests because he had failed to establish a "well-founded fear of persecution" on any of the recognized statutory grounds. With respect to the CAT protection claim, the IJ concluded that Sutaj "has not demonstrated that specific grounds exist to indicate that the Albanian government or other individuals working for the Frroku brothers will torture him upon his return" to Albania, and that therefore, he had "not met his burden of showing that there is a 50 percent chance or greater that he will be tortured by or at the instigation of or with the consent or acquiescence of a public official of Albania." (AR at 179).

The BIA affirmed the IJ's denial of Sutaj's applications for asylum and the withholding of removal. However, in a July 13, 2016, opinion, the BIA faulted the IJ's initial CAT decision for insufficient legal analysis and a failure to adequately consider an

---

[3] One somewhat telling note was Sutaj's failure to admit, until cross-examined on the subject, that he had traveled from Albania twice before coming to the United States, returning each time without incident.

expert witness report offered by Sutaj on the abysmal state of human rights in Albania. The BIA remanded the case to the IJ for further proceedings on Sutaj's CAT claim.

After considering additional evidence, including testimony from Dr. Jana Arsovska, an expert on organized crime in Albania, the IJ again denied Sutaj's application for CAT protection. The IJ noted that Sutaj had not established that he had been tortured in the past, and that Dr. Arsovska's report and testimony, while amply establishing the sinister influence and power of the Frroku brothers and their criminal network, provided no details specific to Sutaj or his alleged undercover police work. The IJ further noted that Sutaj had not been called as a witness in any criminal prosecution against the Frroku brothers[4] and that no member of his family in Albania had been harmed or threatened by the Frrokus, much less by any Albanian government official.

On April 14, 2017, the BIA affirmed the IJ's decision. The BIA concluded that "for purposes of establishing eligibility for protection under the CAT, the applicant has not demonstrated that upon his removal, it is more likely than not that he will be tortured by or with the acquiescence (including 'willful blindness') of a public official." (AR at 7). The BIA agreed with the IJ that Dr. Arsovska's testimony was "generalized evidence" that was "insufficient to establish the applicant's eligibility for relief under the CAT." (*Id.*) Sutaj filed this timely appeal.[5]

---

[4] According to Sutaj, Arben Frroku was apprehended in the Netherlands and extradited to Albania to face charges for the murder of Lamaj. (*See* Sutaj Br. at 30 (citing news articles)).

[5] The appeal is limited to the issue of whether the IJ and the BIA erred in denying Sutaj CAT protection. Sutaj does not challenge the denial of his applications for asylum

## II. Discussion

When the BIA adopts an immigration judge's decision and reasoning, we review both rulings.[6] *See Quao Lin Dong v. Att'y Gen.*, 638 F.3d 223, 227 (3d Cir. 2011). While this Court reviews constitutional claims and questions of law de novo, *see Myrie v. Att'y Gen.*, 855 F.3d 509, 515 (3d Cir. 2017), we apply a deferential standard of review to CAT claims, under which "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). We will uphold the BIA's factual findings as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Alimbaev v. Att'y Gen.*, 872 F.3d 188, 196 (3d Cir. 2017).

To be eligible for CAT protection, an applicant must show that it is "more likely than not" that he will be tortured "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," *Pieschacon-Villegas v. Att'y Gen.*, 671 F.3d 303, 310-311 (3d Cir. 2011). We have explained that an act constitutes torture for purposes of CAT if it "caus[ed] severe physical or mental pain or suffering . . . [was] intentionally inflicted . . . for an illicit or proscribed purpose . . . by or at the instigation of or with the consent or acquiescence of a

---

and withholding of removal, and we therefore consider these claims waived. *See Laborers' Int'l Union v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court.") (internal quotation marks and citation omitted).

[6] The BIA had jurisdiction under 8 U.S.C. § 1103 and 8 C.F.R. § 1003.1(b)(3). We have appellate jurisdiction pursuant to 8 U.S.C. § 1252(a).

public official who has custody or physical control of the victim . . . and . . . [did] not aris[e] from lawful sanctions." *Auguste v. Ridge,* 395 F.3d 123, 151 (3d Cir. 2005). The determination that a CAT applicant is (or is not) likely to be tortured in the future is a factual finding that we review under the substantial evidence standard. *See Kaplun v. Att'y Gen.*, 602 F.3d 260, 271-72 (3d Cir. 2010).

Sutaj argues in a conclusory fashion that "the agency record reflects the Frroku brothers' ability to inflict torture and death upon the Petitioner with the acquiescence of corrupt government elements with direct ties to the Frroku brothers." Sutaj Br. at 12. He also argues that, as shown by Dr. Arsovska's testimony, organized crime has so thoroughly infiltrated the Albanian government that the "official acquiescence" requirement is satisfied on a theory of "willful blindness." Sutaj Br. at 17 (citing *Matter of W-G-R-,* 26 I & N Dec. 208, 226 (BIA 2014); *see also Myrie,* 855 F.3d at 516 ("Circumstantial evidence may establish acquiescence to targeted acts of violence even when the government has an official policy or is engaged in a campaign of opposition against the entity the applicant fears."). Finally, he argues that the BIA failed to properly credit the fact that the IJ had found his testimony credible.

While we accept the IJ's finding that Sutaj's testimony was credible, we cannot conclude that the record as a whole compels a conclusion contrary to the one reached by the BIA. While Sutaj alleges that he was in constant fear for his life after the assassination of Lamaj, the record evidence points in the opposite direction: Sutaj returned to Tirana from Pukë in 2015 seeking work, notwithstanding his alleged fears for his personal safety, and he travelled to and from Albania at least twice using his Albanian

8

passport, during the time in which he was ostensibly in hiding, in fear for his life were his identity to be exposed. On neither of these trips did he seek asylum or any other form of relief, choosing instead to return to Albania. We agree with the BIA that substantial evidence supports the IJ's conclusion that Sutaj would not be subject to torture upon his return to Albania, much less that torture at the instigation, or with the acquiescence of, government officials would occur.

Sutaj also argues that the IJ "particularly erred" in concluding that Dr. Arsovska's export report did not "contain[] any information that is specific to respondent." Sutaj Br. at 28. We do not agree. While Dr. Arsovska was accepted by the IJ as an Albanian country expert and opined that there was a "great chance" that Sutaj would be killed or tortured if returned to Albania, (AR at 292), her testimony as a whole is bereft of evidence corroborating Sutaj's claims of a personal role in the official investigation of the Frroku brothers or his connection to Lamaj. Indeed, Dr. Arsovska conceded on cross-examination that she did not pursue any such evidence with her sources in Albania nor could she verify that Sutaj had ever worked with Lamaj, much less that the work had involved an investigation of the Frroku brothers. Nor could she independently confirm the incident in which Sutaj alleged that he had been stopped and shot at while driving to his sister's home. Finally, she testified that she was unaware that Sutaj had traveled freely to and from Albania on more than one occasion when he was allegedly in hiding in fear of his life.

In sum, we do not believe that the record compels a conclusion contrary to the BIA's finding that this "generalized evidence [was] insufficient to establish the

9

applicant's eligibility for relief under the CAT." (AR at 7). *See Sevoian v. Ashcroft*, 290 F.3d 166, 175 (3d Cir. 2002) (petitioner seeking CAT protection must show "by objective evidence" that it is more likely than not that he or she would be tortured if removed to the proposed country of removal). While we do not diminish Dr. Arsovska's testimony that organized crime is a serious public menace in Albania, that general proposition, however true, does not standing alone entitle Sutaj (or any other Albanian citizen) to personal relief under CAT.[7]

### III. Conclusion

Because the record evidence supports the conclusions of the BIA and the IJ that Sutaj had failed to establish that it was more likely than not that he would be subject to torture with the acquiescence of government officials were he to be returned to Albania, we deny the petition.

---

[7] In a final bid for reversal, Sutaj faults the BIA for violating his due process rights by neglecting to consider "evidence relevant to the possibility of future torture." Sutaj Br. at 35 (quoting 8 C.F.R. § 1208.16(c)(3)). He takes issue, in particular, with the BIA's observation that he had not been asked to testify against the Frroku brothers. While the thrust of the argument is not altogether apparent, it is clear that this was only one piece of the evidence that the BIA reviewed in rejecting Sutaj's CAT claim. Far from any rush to judgment, the BIA remanded the case to the IJ to compile additional evidence, including Dr. Arsovska's testimony, on the prospect that Sutaj might likely be subject to torture by the Frrokus or their catspaws. In our view, Sutaj received all of the process which he was due, and more.